ORIGINAL

OF COUNSEL:
DAVIS LEVIN LIVINGSTON

MARK S. DAVIS          1442
MICHAEL K. LIVINGSTON  4161
YVONNE L. GEESEY        8785
400 Davis Levin Livingston Place
851 Fort Street
Honolulu, Hawai`i 96813
Telephone: (808) 524-7500
Fax: (808) 356-0418
Email: mdavis@davislevin.com

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 04 2010

at 3 o'clock and 40 min. ℓ M.
SUE BEITIA, CLERK

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| **TARSHIA WILLIAMS,** individually and as the Personal Representative of the Estate of **TALIA WILLIAMS,** a Deceased Minor,<br><br>         **Plaintiff,**<br><br>    **vs.**<br><br>**UNITED STATES OF AMERICA,**<br><br>       **Defendant.** | CIVIL NO. 08-00437 ACK/BMK (Federal Tort Claims Act)<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT AND CERTIFICATE OF SERVICE**<br><br>*Hearing:*<br><br>*Date* : ***March 25, 2010***<br>*Time* : ***9:00 a.m.***<br>*Judge* : ***Alan C. Kay***<br><br>**Non-Jury Trial:   March 1, 2011** |

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................1

II.  SUMMARY OF RELEVANT FACTS ..........................................2

III.  SUMMARY OF RELEVANT LAW ..........................................15

IV.  ARGUMENT ..................................................................................24

     A.    The Government Admits that Its Employees Owed an Actionable
           Duty of Care to Talia, Thereby Defeating Summary Judgment    24

     B.    The Military Operates Its Own System of Child Protective Services
           for Reporting, Investigating, Evaluating, and Intervening in Suspected
           Child Abuse on Its Installations    25

     C.    The Government's Substitution of Its Own Child Protective System
           for the Hawai`i's CPS Created a Duty Flowing to Children Identified
           Within the Substitute System as Being the Subject of Suspected
           abuse    33

     D.    There Are at Least Three Additional, Independently Sufficient
           Grounds for a Determination that the Government Had a Duty to
           Protect Talia    35

V.  CONCLUSION..................................................................................37

# TABLE OF AUTHORITIES

*Cases*

Doe Parents v. State of Hawaii,
    100 Haw. 34, 58 P.3d 545 (2002) ................................................20, 21

Figueroa v, State,
    61 Haw. 369, 604 P.2d at 1198 ........................................... 16

Fochtman v. Honolulu Police and Fire Department,
    65 Haw. 180, 649 P.2d 1114 (1982) ...................................36

Indian Towing Co. v. United States,
    350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1055)...........................passim

Kaho'ohanohano v. Department of Human Services,
    117 Haw. 262 (2008).........................................................passim

Nationwide Mut. Ins. Co. v. United States,
    3 F.3d 1392 (10th Cir. 1993)............................................ 16

Sheridan v. United States,
    487 U.S. 392 (1988) ..........................................................passim

Tabieros v. Clark Equipment Co.,
    85 Haw. 336, 944 P.2d 1279 (1997) ...................................36

Tekle v. United States,
    511 F.3d 839 (9th Cir. 2007)............................................. 19

United States v. Olson,
    546 U.S. 43 (2005) ..........................................................18, 19, 37

*Statutes*

28 U.S.C. §1346(b) (2000) ...................................................... 16
28 U.S.C. §1346(b)(1) ............................................................ 18

28 U.S.C. §2674 (2000) ............................................................................... 16
H.R.S. §707-712 ........................................................................................... 3
H.R.S. §709-903.5 ................................................................................... 3, 36
H.R.S. §350-2 ............................................................................................. 23
H.R.S. §587-21(4) ....................................................................................... 22
H.R.S. Chapter 350 ....................................................................23, 25, 29, 34

*Other Authorities*

AR 608-18 ............................................................................................ passim
AR 608-18 §1-1 ..................................................................................... 26, 28
AR 608-18 §1-5 ........................................................................................... 26
AR 608-18 §2-11 ......................................................................................... 27
AR 608-18 §2-12 ......................................................................................... 27
AR 608-18 §2-14 ......................................................................................... 27
AR 608-18 §2-15 ......................................................................................... 27
AR 608-18 §3-4 ........................................................................................... 31
AR 608-18 §3-4(b) ...................................................................................... 32
AR 608-18 §II (3.3 – 3.7) ............................................................................ 28
AR 608-18 §III (3-8 – 3-19) ........................................................................ 28
AR 608-18 §V (3-23 – 3-30) ....................................................................... 28
AR 608-18 Chapter 3 ................................................................................... 28
AR 608-18 Chapter 4 ................................................................................... 28
AR 608-18 Chapter 5 ................................................................................... 28
AR 608-18 Chapter 6 ................................................................................... 28
AR 608-18 Chapter 7 ................................................................................... 28
AR 608-18 Chapter 8 ................................................................................... 28
AR 608-18 Chapter 9 ................................................................................... 28

*Treatises*

§314a of the Restatement (Second) ............................................................. 20
§315 of the Restatement (Second) of Torts ................................................. 21
§315(b) of the Restatement (Second) of Torts ............................................ 24
§324A of the Restatement (Second) of Torts .........................................35, 37
38 Am.Jur. *Trials 1* §9 (1989) .................................................................. 22
Restatement (Second) of Torts §286 (1965) ............................................... 22
Restatement §315(b) .................................................................................... 21

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Five-year-old Talia Williams was tortured from January 2005 until she was finally murdered on July 16, 2005. Her father, Naeem Williams, has been charged by the Government with Talia's murder, and awaits a death penalty trial scheduled for January 2011. Talia's step-mother, Delilah Williams, pled guilty to related charges and is incarcerated. The factual record, developed through the criminal investigation and through discovery within this civil lawsuit, leaves absolutely no question that Government social workers, medical providers, law enforcement officers, family advocacy workers, abuse investigators had been informed of the abuse and had multiple opportunities to prevent the torture and murder of Talia Williams during the six-month period from January to July 2005. It is also beyond dispute that during this same period Government employees repeatedly ignored their obligations under both Hawai`i State law and applicable Army regulations intended to protect children like Talia from abuse. Despite this incontrovertible evidentiary record of shameful conduct by Government employees, the Government now moves for summary judgment seeking a ruling from this Court, that the Government had no duty to act in response to the evidence of Talia's abuse.

The Government's moving papers present an amalgam of legal arguments based on distorted and largely unsupported factual contentions. The crux of the Government's argument seems to be that it owes no duty whatsoever to protect the dependent children who are shuttered away on military installations, isolated from the community at large, even in the face of suspicions that they are being abused. To make this specious argument, the Government simply ignores the fact that the military operates its own child protective system on its installations, mirroring the State's Child Protective Services (CPS), and that Talia was a victim of gross negligence within that military system. And, just as State CPS workers owe an actionable duty to children who come into the State's child protective system, workers within the military child protective system owe a duty to children who enter that system. Kaho'ohanohano v. Department of Human Services, 117 Haw. 262 (2008).

## II.    SUMMARY OF RELEVANT FACTS[1]

On about December 4, 2004, U.S. Army soldier, Naeem Williams, moved his 4-year-old daughter, Talia, to Hawai`i after being granted custody by a South Carolina Court, despite the fact that he was a stranger to Talia. Talia lived with

---

[1] All factual statements included in this section are taken from Plaintiffs' Separate Concise Statement, which provides references to the evidentiary record in the case.

Naeem and her stepmother Delilah on Schofield Barracks until they moved to a home on Wheeler Army Airfield, both U.S. Army installations.

The Williams home was a violent one. On January 10, 2005, Naeem was ordered to live in U.S. Army barracks due to a physical altercation with Delilah. It was at least the third time that Naeem had been ordered to barracks. The next day, an enraged Delilah took Talia to the barracks. Delilah found Naeem and physically attacked him screaming obscenities as Talia stood by watching. First Sergeant Esteban Florentino intervened and instructed Delilah to leave. Delilah screamed back, "fuck no, I am going to fuck his shit up." Delilah pushed Florentino as she stormed in and out of the room, throwing shoes and objects. Florentino believed that Talia was in "harm's way" during Delilah's rampage.

The U.S. Military Police (MPs) arrested Delilah on two counts of Assault in the Third Degree, violations of H.R.S. §707-712, and because of concern for Talia, she was charged with one count of Endangering the Welfare of a Minor, a violation of H.R.S. §709-903.5. The involvement of the MPs indicates that the incident, which involved suspicions of both spouse and child abuse, was reported to the installation Report Point of Contact (RPOC) which on Army Installations was the Military Police. The MPs, however, failed to report the incident to either the Department of Human Services Child Welfare Services Branch (DHS-CWSB or

CPS) or to the Honolulu Police Department (HPD), even though they believed that probable cause existed that Delilah had endangered Talia.

As a follow up to this arrest, on February 1, 2005, Naeem's command referred the couple to Social Worker Terry J. Martin, of the U.S. Army's Family Advocacy Program's Department of Social Work. The Family Advocacy Program is based on Armed Forces regulations focused on the prevention, identification, reporting, investigation, and treatment of spouse and child abuse. Martin interviewed Delilah and Naeem separately, for a total of two hours.

Martin found the Williams family to be deeply troubled and extremely volatile.   He noted the "presence of classic dynamics of family violence," documenting "[w]ifes anger and her inability to manage it."   He found "emotional/verbal aggression present in relationship," and identified "Marital Discord/Infidelity/Poor Communication Skills" as psychosocial stressors in the family. During his assessment, however, Martin completely ignored Talia, including the fact that Delilah had been arrested for Endangering the Welfare of a Minor.   In this regard, Martin incorrectly reported: "The four-year-old was not present during the incident.  4-year-old was not interviewed."

Martin recommended the charges against Delilah Williams be dismissed, with a finding of "Unsubstantiated (Unresolved) Mild Physical Spouse Abuse by Wife against SM [i.e., Service Member]."   Again, Martin ignored the danger to

4

Talia and made no recommendations as to disposition of the charge of Endangering the Welfare of a Minor. Nor did Martin report the incident, or the danger to which Talia was exposed, to CPS or HPD. However, as noted above, the installation RPOC already was on notice of the suspicions of both spouse and child abuse.

On February 16, 2005, the Case Review Committee (CRC) of the U.S. Army's Family Advocacy Program met to discuss Delilah Williams' arrests for Assault and for Endangering the Welfare of a Minor. The involvement of the CRC indicates that the military's child protective system had been engaged to evaluate the suspicions that Talia had been subjected to abuse or neglect. Perhaps relying on Martin's erroneous report, the CRC also ignored Talia's presence during the January 10, 2005 incident, and characterized Delilah's rampage at the barracks as "minor physical spouse maltreatment to victim, Naeem J. Williams." Further, despite the statement of eye-witness Florentino, who had himself been assaulted by Delilah during the incident, the CRC deemed the incident to be "unsubstantiated." Based on this fiction, the CRC recommended "No Actions" for both Delilah and Naeem. Talia's safety and welfare was not even addressed in the CRC's recommendations. On February 16, 2005, Naeem's First Sergeant approved the CRC recommendations. Of course the CRC never reported the incident, or the fact that Talia was living in a violent home, to CPS or to HPD.

On February 28, 2005, Program Assistants at the Schofield Barracks Child Development Center (CDC) discovered bruises on both of Talia's arms, on the middle of her back, and all around her buttocks. Alarmed, they called the Military Police, thereby effectively notifying the RPOC for the installation.

Agent Michael Parker of the United States Army Criminal Investigation Division (CID) was assigned to investigate allegations of child abuse. As he began his investigation, he knew that workers at the CDC had seen "unusual marks" which they believed "could be indications of assault or abuse." He also knew that Talia had identified her father and mother as the source of the bruising.

Based on his training, however, he believed that the CDC was not "the proper environment to go into [detailed] questions as to whether bruises were inflicted by her mother or father," and that those questions were more properly asked by a "forensic child interviewer." Parker's beliefs were consistent with applicable Army regulations. Nonetheless, Talia was never interviewed by an appropriate professional.

As part of his investigation, Parker asked the Military Police to run "background checks" on Naeem, Delilah and Talia Williams, including a scan of the Military Police data base and the National Crime Information Center. He was told that no reports of suspicious activity existed. The January 11, 2005 arrest of Delilah Williams should have been in the MPs data base.

(SBACC) at approximately 6:15 pm for a suspected child abuse case. Miller arrived at the scene and was told by a CID investigator that the doctor had found no sign of child abuse and that there was nothing for Miller to do there. Miller did not enter the clinic or see the child himself.

The decision to file a police report is a judgment call. In the above case, Miller did not feel a report was needed because of what CID told him so a report was not filed.

As this report indicates, Parker made a decision that Talia's self-report that she had been beaten by her father with Mr. Paddle was not credible. He walked out to the HPD officer and told him that the child care workers' suspicions that Talia was being abused should not be reported to CPS. The HPD officer relied on Parker's decision and did not report the suspected abuse to CPS.

Incredibly, the child care workers who had reported the suspected abuse were instructed to return Talia to her parents that same night. Although they were scared and thought the doctor who had made the determination that Talia's bruises were a "skin condition" did not know what he was doing, they did as they were instructed. A few days later, Talia's parents removed her from the CDC.

As of May 2005, Delilah Williams worked for the Office of Child Youth Services (CYS) at Schofield Barracks, under the supervision of Assistant Outreach Director Rochelle Goodwin, Outreach Director Kristy Almeida, and CYS Chief, Marla Menard. The responsibilities of CYS clerks included registering parents of military families who wanted to sign up their children for services on post.

Delilah's supervisor, Rochelle Goodwin, was aware of the February 28, 2005 investigation into suspicions that Talia had been abused by her parents. Goodwin also knew that Delilah had "anger management" issues, due to the way Delilah spoke with customers and co-workers.   On more than one occasion, Delilah's telephone conversations with Naeem had become so "heated" that Goodwin asked Delilah to complete the conversation elsewhere.

Goodwin also knew that Delilah abused Talia, both emotionally and physically.  She knew, for example, that Delilah would make Talia sit on the toilet for up to 45 minutes in response to incontinence.   And, although Delilah and Naeem claimed to stop spanking Talia after the February 28, 2005 investigation for fear that Talia would "tell," Goodwin knew by May, 2005 that they were hitting Talia again.  In fact, Goodwin's knowledge of the beatings came directly from Delilah.  At the end of May, Delilah entered Goodwin's office and revealed that "now Talia knows that when we close the window no one can hear her when we whip her so there's no point in screaming," and that "her screaming doesn't matter now because we close the windows when we beat her."  Delilah's comments were overheard by a second CYS worker, Donna Small.

Small, horrified at what she had heard, asked Goodwin what she was going to do about Delilah's remarks. Goodwin assured her that she would speak with the Family Advocacy Program about the couple's abuse of Talia.   The next day,

however, Goodwin reneged on her promise, telling Small that she couldn't go through with it. Goodwin indicated that she had some pamphlets she would give to Delilah. Despite the fact that Goodwin was a "mandated reporter" under both Hawai`i State law and Army regulations, she failed to report her suspicions of Talia's abuse and neglect to CPS or to HPD, or to the RPOC on the installation.

CYS employee Small remained concerned about Talia. On June 27, 2005, she went directly to the Manager of the Family Advocacy Program, Hilda Borja. Borja, a social worker, was the "principle command functionary on family abuse matters." Borja therefore managed the military's child protective system for family abuse at the Schofield installations. Small told Borja that she believed that Talia was in danger and that she and her supervisor at CYS, Rochelle Goodwin, suspected abuse. Small told Borja of Delilah and Naeem's history, and informed Borja that they were leaving Talia alone during the day (a fact which she inferred from Delilah screaming into the telephone "what the f...was she doing when you got there? Brushing her f...teeth. I told her to sit on the f...toilet"). In addition, Small reported to Borja that Delilah had stated that it was "okay to whip a child, just don't leave any marks." Small's report to Borja should have engaged the military's child protective system on Talia's behalf.

After the meeting, Borja sent Small an email, saying that she needed to see her right away. When Small reached the office, she was told that "Hilda [Borja]

couldn't talk to me and would get back to me." Borja never did get back to her. Although Borja called the RPOC, she did not report the suspicion that Talia was being abused by her parents. Borja was fired for her failure to report.

On June 29, 2005, Maribel Martinez called the MPs to report that a child who lived in the house behind hers had been screaming for over an hour. Although Martinez was not a mandated reporter, her report to the MPs effectively notified the installation RPOC of possible abuse. Military Police Officers Shaun Baus and Sarah Black were sent to the Williams residence, located at Unit #104, 195 Ohaiula Court on Wheeler Army Airfield. They found Naeem and Delilah, who was smoking a cigarette and holding a baby, outside the home.

Delilah claimed that she and Naeem had been arguing, but that everything was "fine." She also claimed that no other individuals were inside the home. Despite her assurances, the officers decided to do a "walk through." They entered the home, and found it dark. When they attempted to walk upstairs, Naeem pushed the officers out of the way so that he could get upstairs first. Once upstairs, the officers observed Talia in one of the rooms, naked and mute, with feces on the floor. Not surprisingly, Officer Black felt that "something did not look right." Officer Baus attempted to speak with Talia, but Talia "was like a rock," and would not answer questions.

The officers called for further investigation.  By this point, the installation's child protective system clearly had been engaged.  MP Investigator Myers was sent to the residence to investigate.   Myers found injuries to Talia's face. Naeem explained that she received her injuries by falling at a birthday party.  Yet Naeem did not provide Myers the name of the child who allegedly had the birthday party where Talia had been injured.   Myers did not obtain a statement from Talia as to how she had been injured.   Although Myers notified his desk sergeant of his findings, he took no other action and left the scene, noting the presence of an unnamed Family Advocacy Program social worker.   None of the mandated reporters investigating this incident, i.e., Baus, Black, Myers, or the unnamed social worker - ever reported the suspected abuse and neglect of Talia to CPS or HPD.

On July 5, 2005, Delilah's cousin, Chasidy Taijeron, heard Naeem cursing and hitting Talia, and heard Talia crying, during a telephone conversation with Delilah.  Delilah told Taijeron that Naeem was punishing Talia because Talia had eaten his favorite doughnut.  Naeem beat and swore at Talia for at least two hours.

REDACTED

REDACTED

On July 11, 2005, Taijeron called CPS to report suspected child abuse and spoke with CPS Intake Worker Phil Hartman. Hartman completed an Intake Contact Log of an anonymous call.   He documented the perpetrator as "Williams or William" and noted that "stepmother suspected of mistreating 5-year-old, will re-contact with correct name and address."   Hartman's narrative account listed "Tillia 5" as the child, the mother as "Delila William?" and the father as "William."   According to the narrative, the caller reported that the stepmother had been yelling and cursing at the child and the child recently had told the caller she had to sleep on the floor. Further, the stepmother had told the caller that she leaves the child at home when she runs errands, and that there had been an incident several months ago at daycare. However, no phone number, address or information on the father was provided.   The caller said she would re-contact CPS with the correct information.

CPS had never received information regarding Talia before Taijeron's call. Consequently, CPS had no file open on Talia or the Williams family, and had no information that could be used to identify the family or intervene.

CYS employee Small remained concerned about Talia.  On July 13, 2005, Small brought her husband to speak with Goodwin's immediate supervisor at CYS, Director Kristi Almeida.  Almeida wanted to know if Small was reporting as an employee of CYS or as a concerned citizen.  Almeida stated that if Small was reporting as an employee, she would have to do it during a period of administrative leave. Despite this bureaucratic dodge, Almeida contacted her supervisor, Marla Menard, to ask the procedure for reporting child abuse.  Menard told Almeida to put the responsibility back on Small, and have Small contact the Military Police. All of these CYS employees - Almeida, Goodwin and Small - were "mandated reporters" under both Hawai`i State law and the Army regulations.  Yet none of them reported their suspicions that Talia was being abused to CPS or HPD, or to the installation RPOC.

REDACTED

After Delilah made arrangements for a cousin to care for her biological child, they

called for assistance.  Talia was taken to Wahiawa General Hospital where she was

pronounced dead.

REDACTED

U.S.  Army  Major  General  Benjamin  Mixon  ordered  a  post-mortem

investigation  into  the  involvement  of  United  States  Army  personnel  in  Talia

Williams' death.  On October 5, 2005, Gen. Mixon concluded that the death of

Talia Williams "followed a series of missed opportunities to potentially prevent the

death of the child," and documented at least five of these "missed opportunities."

## III.    SUMMARY OF RELEVANT LAW

In its moving papers, the Government concedes that the Hawai`i Supreme

Court's recent decision in <u>Kaho'ohanohano</u>, is the "most applicable" case law with

respect to the question of whether the Government owed an actionable duty of care

to  Talia.  Memo,  p.  12.  Contrary  to  the  Government's  argument,  the

Kaho'ohanohano case provides compelling support for a finding that such a duty exists.

Even though the Kaho'ohanohano case was brought under the Hawai`i State Tort Liability Act ("STLA"), the Hawai`i Supreme Court turned to federal cases for guidance based on its recognition that the STLA was "modeled" after the FTCA:

> The Federal Tort Claims Act (FTCA), upon which the STLA is modeled, Figueroa, 61 Haw. at 383-84, 604 P.2d at 1206, provides that the United States shall be liable under state tort law only "in the same manner and to the same extent as a private individual *under like circumstances*." 28 U.S.C. §2674 (2000) (emphasis added); *see also* 28 U.S.C. §1346(b) (2000) (liability exists "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred").

Kaho'ohanohano. As the Hawai`i Supreme Court recognized, however, "[n]ice pieces of casuistry and hypersensitive legalisms" are to be avoided in connection with the determination of "like circumstances":

> Recognizing that the United States is seldom situated identically to private parties, however, the "like circumstances" inquiry requires only that the United States be analogized to a similarly situated private party. Indian Towing Co. v. United States, 350 U.S. 61, 64, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1055).

Id., at 283, quoting Nationwide Mut. Ins. Co. v. United States, 3 F.3d 1392, 1396 (10th Cir. 1993).

The Kaho'ohanohano Court's citation to the United States Supreme Court's decision in Indian Towing Co., is revealing. There, the United States Supreme Court found the Coast Guard liable under the FTCA for its failure to keep a government lighthouse properly functioning, or to give warning that it was not functioning:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.

Id., at 69.

Thirty-three years later, the United States Supreme Court issued its decision in the FTCA case of Sheridan v. United States, 487 U.S. 392 (1988).   Sheridan was a case in which three Navy corpsmen found another Navy enlisted man, Carr, lying face down in a drunken stupor on the concrete floor of a hospital building. They attempted to take him to the ER, but he broke away, grabbing a bag which opened to reveal the barrel of a rifle.  The corpsmen fled, and took no further action to subdue Carr or alert authorities.  Later that evening, Carr fired shots that injured one of the plaintiffs.  The trial court granted the Government's motion to dismiss, and the Court of Appeals affirmed.  In reversing, the US Supreme Court noted that the Government had adopted regulations that undertook "good

Samaritan" responsibilities to ensure that nobody on the naval base possessed a firearm without authorization and that visibly drunk and dangerous persons were restrained. Citing <u>Indian Towing</u>, the Supreme Court held that having voluntarily assumed these obligations, the Government had a duty to perform them non-negligently, and was liable to the Sheridans for its breach of that duty:

> By voluntarily adopting regulations that prohibit the possession of firearms on the naval base and that require <u>all personnel</u> to report the presence of any such firearm, and by further voluntarily undertaking to provide care to a person who was visibly drunk and visibly armed, the Government assumed responsibility to "perform its Good Samaritan task in a careful manner." <u>Indian Towing Co. v. United States</u>, 350 U.S. 61, 65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955).

<u>Sheridan</u>, 487 US at 401.

The <u>Sheridan</u> case was revisited by the United States Supreme Court in <u>United States v. Olson</u>, 546 U.S. 43, 44-45 (2005), a decision cited by the Government in its moving papers.  In <u>Olson</u>, the Supreme Court was faced with claims under the FTCA based on allegedly negligent inspections by federal mine inspectors. The Court reversed a line of cases from the Ninth Circuit basing liability under the FTCA on local law that would make a state or municipal entity performing similar functions liable. <u>Id.</u>, at 44. The Court emphasized that the FTCA means what it says – "namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a '*private person*' liable in tort." <u>Id.</u>, quoting 28 U.S.C. §1346(b)(1)). The <u>Olson</u> Court rejected the

notion that the United States would be liable only if a state or municipal entity would be liable. Id., at 45-46.  In reaching its decision, the Olson Court relied heavily on Indian Towing:

> In Indian Towing Co. v. United States, 350 U.S. 61, 64, 76 S.Ct. 122, 100 L.Ed. 48 (1955), this Court rejected the Government's contention that there was "no liability for negligent performance of 'uniquely governmental functions.' " It held that the Act requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA "in the performance of activities which private persons do not perform." *Ibid.*

Id., at 46.  The Olson Court emphasized that under Indian Towing, the words "'like circumstances' do not restrict a court's inquiry to the *same circumstances,* but require it to look further afield." Id., at 47.  And just as in Indian Towing the duties of a lighthouse operator were held to be analogous to the duty of "a private person 'who undertakes to warn the public of danger and thereby induces reliance,'" the Olson Court noted that "there are private persons in 'like circumstances' to federal mine inspectors, namely, private persons who conduct safety inspections." Id., at 47.

In the wake of Olson, the Ninth Circuit decided Tekle v. United States, 511 F.3d 839 (9th Cir. 2007).  Tekle was a Bivens and FTCA case brought against federal law enforcement officers and the Government alleging the use of excessive force in detaining an unarmed and barefoot 11-year-old boy during the arrest of his father. In deciding Tekle, the Ninth Circuit took the following lesson from Olson:

19

The Court thus stated in no uncertain terms that we erred by restricting the FTCA to the liability of government entities. Even if the conduct entails uniquely governmental functions, the court is to examine the liability of private persons in analogous situations.

Id., at 851-852 (citation deleted).

The United States Supreme Court's decision in Sheridan was also cited with approval by the Hawaii Supreme Court in the case of Doe Parents v. State of Hawaii, 100 Haw. 34, 63, 58 P.3d 545, 574 (2002).  Doe Parents involved claims against the State of Hawaii and the Department of Education under the State Tort Liability Act ("STLA") arising out of the molestation of two elementary school children by a teacher.  As in Kaho'ohanohano, the Doe Parents decision expressly recognized that the STLA is modeled after the FTCA, and emphasized that the STLA "should be liberally construed to effectuate its purpose to compensate victims of negligent conduct of state officials and employees in the same manner and to the same extent as a private person in like circumstances." Doe Parents, 100 Haw. at 66.

The Doe Parents decision addressed at length the question of when a "custodial" relationship gives rise to a "special relationship" duty of care. Reaffirming prior Hawai`i case law recognizing that the list of "special relationships" in §314a of the Restatement (Second) Torts is not exhaustive, the Doe Parents Court explicitly noted that a custodial relationship is one genre of special relationship that gives rise to a duty. Id., at 71. Yet, the Court noted that a

duty of care can arise not only as a result of a special relationship, but also as a result of an administrative rule or regulation that mandates that the defendant adhere to a particular standard of conduct, or as the result of an affirmative undertaking or act by the defendant. Id.   In this regard, the Court recognized that, under Sheridan, the act of promulgating a policy or regulation can itself constitute a voluntary affirmative act that gives rise to a duty to exercise reasonable care to follow that policy or regulation.

It is within the context of this body of federal and state case law that the Kaho'ohanohano decision must be interpreted and applied to this FTCA case.

In Kaho'ohanohano, the Hawai`i Supreme Court directly addressed the question of "whether a private analogue existed for an action based on DHS's failure to perform its alleged statutory duty to assist children seeking protection from reported abuse." Kaho'ohanohano.   Citing the Doe Parents case, the Kaho'ohanohano Court held that a private analog did exist based on §315 of the Restatement (Second) of Torts, which provides in relevant part that:

> "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless ... (b) *a special relation exists between the actor and the other which gives to the other a right to protection.*"

Id., *quoting* Restatement §315(b) (emphasis added by Kaho'ohanohano Court).

Having concluded that a private analogue was present in the form of a "special relationship," the Court next turned to the question of whether Hawai`i's

statutory and regulatory mandates created a duty of protection owed to children identified to DHS as the subjects of suspected abuse.  After chronicling in some detail the statutory and regulatory mandates that specify how DHS must respond to reports of suspected child abuse, the Kaho'ohanohano Court provided the following explanation for its determination that "DHS had a duty to protect" the abused Minor:

> Based upon the above statutory and regulatory mandates, the legislature - in our view - *has* created a duty flowing to children specifically identified to DHS as being the subject of suspected abuse. In other words, DHS is obligated to protect that specific class of children from a specific kind of harm that will likely continue if the statutory duty is ignored. DHS is given not just a specific duty to act in response to such a report but ample and detailed authority to do so.
>
> There can be no dispute that the relevant statutory provisions, along with its administrative rules and policies, create a duty on the part of DHS to assist a particular class of persons to which Minor belongs and to prevent the type of harm suffered by Minor. *See* Restatement (Second) of Torts §286 (1965) (courts may adopt, as standard of conduct, requirements of statutes "whose purpose is found to be exclusively or in part ... to protect a class of persons which includes the one whose interest is invaded"). The plain language of Chapter 587, read in conjunction with its purpose, clearly demonstrates the legislature's intention that DHS and its social workers act immediately when specific reports of abuse or neglect are received. The call for immediate action necessarily requires intervention by DHS and its social workers in situations involving non-custodial individuals such as Minor. *See* 38 Am.Jur. *Trials 1* §9 (1989) (stating that "social workers[, among others,] are regarded as the first line of defense in the war against child abuse because they are most likely to come in contact with maltreated children when symptoms of abuse, neglect, or molestation are most apparent"). Indeed, one of the decisions required to be made by DHS is whether to file a petition with the court to obtain legal and physical custody of the minor. HRS §587-21(4).

> Obviously, DHS would not intervene in a case of abuse or neglect of which it has no knowledge. However, the legislature's call for immediate action once such a report is received underscores the recognition of a special relationship between DHS and the alleged endangered child and a duty on the part of DHS and its social workers to protect that child.

> Accordingly, we conclude that DHS had a duty to protect Minor under the circumstances of this case.

Kaho'ohanohano, at 117 Haw. 290.

This excerpt from the Kaho'ohanohano decision highlights the fact that the entire CPS system for protecting children from abuse depends on the reporting of suspected abuse by trained professionals, as mandated by HRS Chapter 350. Indeed, as the Kaho'ohanohano decision notes, HRS §350-2 "requires DHS to 'proceed pursuant to Chapter 587 and [DHS's] rules' upon receiving a report concerning child abuse or neglect." Id., at 565, n.32. In other words, the actionable duty of protection recognized by the Kaho'ohanohano Court is immediately triggered when suspicions of child abuse are reported into the child protective system.  As the Kaho'ohanohano Court stated, the statutes mandating immediate action by CPS once a report is received "underscores the recognition of a special relationship between DHS and the alleged endangered child and a duty on the part of DHS and its social workers to protect that child." Id. at 291 (emphasis added).

For the reasons set out below, there is no question that, under Kaho'ohanohano and the Indian Towing line of FTCA cases, Talia was owed an

analogous duty of protection by the workers within the military's separate, parallel child protective system.

## IV.   ARGUMENT

### A.   THE GOVERNMENT ADMITS THAT ITS EMPLOYEES OWED AN ACTIONABLE DUTY OF CARE TO TALIA, THEREBY DEFEATING SUMMARY JUDGMENT

The Government admits in its moving papers that "the child care workers who cared for Talia had a special relationship [with Talia]," and that "[t]he standard of care for these workers, as set forth in Chapter 350, requires them to report unexplained physical injuries." Government Memo, p. 3.   In other words, the Government concedes that its child care workers owed a duty to Talia under §315(b) of the Restatement (Second) of Torts. Id., at 11.   The Government goes on to argue that because the child care workers called the Military Police, and then reasonably relied on the doctor's erroneous medical conclusions, they met the applicable standard of care. Id., at 3.

The Government's acknowledgement that its child care workers owed Talia a duty of care arising out of their special relationship with her is alone sufficient to defeat this motion for summary judgment. There are certainly genuine issues of material fact related to whether the child care workers met the applicable standard of care.   Indeed, the Government flatly misstates the evidentiary record in claiming, without any reference to competent evidence, that "the child care

workers reasonably relied on the doctor's medical conclusion that the marks were

the result of a skin condition, and that there were no physical injuries at all, much

less injuries that might have been caused by child abuse." Id.  The record contains

no evidence of such reliance.  In fact, child care worker Chasi Adamany stated in

her sworn statement that her supervisor, Summer Kaopuiki, thought the doctor who

examined Talia "didn't know what he was doing," and that both she and Summer

"were scared" to return Talia to her parents. Exhibit 8.

Although the Government admits that the standard for these workers is set

forth in HRS Chapter 350, it completely glosses over the undisputed fact that the

workers never reported their suspicions of abuse to CPS, as required by Chapter

350.  In other words, it is undisputed that the child care workers owed a duty to

Talia, _and that they breached the applicable standard of care._   Had the child care

workers reported their suspicions of child abuse to CPS, as they were duty-bound

to do, Talia would have been entered into the CPS data bank, and it is highly likely

that she would have been identified as the victim of suspected child abuse when

Delilah's cousin, Chasidy Taijeron, called CPS on July 5, 2005.

**B.     THE MILITARY OPERATES ITS OWN SYSTEM OF CHILD
        PROTECTIVE SERVICES FOR REPORTING,
        INVESTIGATING, EVALUATING, AND INTERVENING IN
        SUSPECTED CHILD ABUSE ON ITS INSTALLATIONS**

The Kaho'ohanohano Court devoted several pages to a recitation of the

various procedures CPS is required to follow in response to a report of suspected

abuse. Kaho'ohanohano, 117 Haw. at 289-90. These procedures ensure that CPS conduct an "immediate" initial investigation to assess the validity of the report and to provide protective services to the child. They also provide a mandatory framework for conducting a thorough assessment of the suspected abuse, including an evaluation of the child and appropriate family members, leading to a "clear decision whether abuse, neglect, or exploitation did or will occur." Finally, the statutory and regulatory framework requires CPS to resolve the allegation of abuse either informally, or through various enumerated interventions.

The Federal Government, through AR 608-18 (and the various regulations implementing AR 608-18), has assumed the responsibility for performing almost all of these functions when the suspected abuse occurs on a military installation. The "Purpose" of AR 608-18 is to establish the Army's policy "on the prevention, identification, reporting, investigation, and treatment of spouse and child abuse." §1-1. That "Policy" is set out in general terms in §1-5, which provides that the Army's "policy is to prevent spouse and child abuse, to protect those who are victims of abuse, to treat those affected by abuse, and to ensure personnel are professionally trained to intervene in abuse cases." The policy "also recognizes a commander's authority to take disciplinary or administrative action in appropriate cases."

AR 608-18 also provides that each Army installation "should establish a cooperative relationship with local communities in identifying, reporting, and investigating child and spouse abuse cases; in protecting abused victims from further abuse in both emergency and nonemergency situations; and in providing services and treatment to families in which child abuse has occurred." §2-11. To achieve this "cooperative approach," each Army installation is "required" to enter into a Memorandum of Agreement ("MOA") with the adjoining local community. §2-12.   AR 608-18 §2-14 describes eight general subject areas that the MOA should address, including the following:

> *d.*   The extent to which reports of child and spouse abuse and case information will be shared by the parties to the MOA with regard to both on- and off-post incidents of child and spouse abuse.
>
> *e.*   The agencies that have primary responsibility for assessing and investigating child and spouse abuse cases and the coordination required.
>
> *f.*   The agencies that are responsible for responding in emergency and nonemergency situations and the actions to be taken in such cases to protect children and spouses from further abuse …

AR 608-18 §2-14. AR 608-18 §2-15 elaborates on these areas of coordination, and provides that each MOA "will delineate local policies, responsibilities, and functions according to this regulation," including "reporting and notification procedures," "crisis intervention," "intake procedures," "assessment/investigation," "case management," and "treatment and support services."

Chapter 3 of AR 608-18 provides a detailed set of mandatory procedures for reporting and evaluating suspicions of child abuse, for protecting victims of child abuse, and for the treatment of child abuse, as follows:

- §II (3.3 – 3.7): "Reporting of Spouse and Child Abuse Incidents";

- §III (3-8 – 3-19): "Evaluations Allegations of Spouse and Child Abuse";

- §IV (3-20 – 3-22): "Protection of Spouse and Child Abuse Victims";

- §V (3-23 – 3-30): "Treatment of Spouse and Child Abuse."

Chapter 4 of AR 608-18 provides guidance with respect to "Disciplinary and Administrative Actions" against soldiers accused of spouse or child abuse occurring within the family.   Chapter 5 relates to the "Army Central Registry" containing a confidential index of victim-based reported spouse and child abuse cases.  Chapter 6 sets out the Army's policies on "Records Management" in cases of substantiated spouse or child abuse. Chapter 7 outlines the procedure for "Transfer of Cases" when there is substantiated abuse and the soldier or affected family member is moving away from the installation.  Chapter 8 deals with "Out-of-Home Cases in Department of Defense Sanctioned Activities," and provides policies and procedures for prevention of child abuse, and early identification and intervention in cases where out-of-home child abuse is suspected. Chapter 9 provides policies and procedures related to "Emergency Placement Care" in cases of suspected abuse.

In short, AR 608-18 provides a comprehensive framework that mirrors CPS but is within the jurisdiction and under the control of the military. This framework creates a parallel on-installation system for reporting suspected child abuse, and for investigating, evaluating, and resolving such reports.

As required by AR 608-18, the Army and DHS entered into a MOA. The express "Purpose" of the MOA is "[t]o establish written procedural guidelines and delineate areas of responsibility between the State of Hawai`i, Department of Human Services (DHS), Child Welfare Services Branch (DHS-CWSB), and military services with regard to matters involving the abuse of children and military families." MOA §1. Exhibit 29. Under the caption "Authority," the MOA describes the overlapping jurisdictions and responsibilities of the Hawai`i CPS and the military's own parallel child protective framework, as set out in AR 608-18 and associated regulations:

3.   Authority.

   a.  The State of Hawaii, through DHS-CWSB, and under the authority granted by Hawaii Revised Statutes, Chapter 350, "Child Abuse," Sections 350-1 -3 and 5 is responsible for the protection of abused children within the State of Hawaii.

   b.  The military commanders, by virtue of the inherent authority as installation commanders and through the specific authority granted under each branch of the service's regulation titled "The Family Advocacy Program," are responsible for the protection of abused children of military families within his/her command, as well as, for maintaining law, order, and discipline on military-controlled property.

> The commander's authority to provide protection for children of military families is limited, however, by the lack of a federal judicial framework in which the status of children can be adjudicated and in which appropriate, judicially managed remedies can be mandated. The commander therefore, relies upon DHS-CWSB to petition the Hawaii Family Court to exercise its authority, where necessary, in cases of abused children of military families.

The MOA goes on to note that the "Family Advocacy Program (FAP)," established by AR 608-18, is

> designed to address all aspects of intervention concerned with maltreatment involving military personnel and their dependents. This intervention includes identification, evaluation, treatment and education, case management, and prevention. The FAP is responsible for coordinating the provision of human services and for interceding on behalf of victims and families.

MOA, §5-a. Exhibit 29.

Despite its purpose of delineating areas of responsibility, the MOA is hardly a model of clarity. Under the MOA, RPOC "is responsible for notifying agencies as required by State Statutes, military regulations and this MOA." §5-b. For the Army, the RPOC for child abuse involving military children is the Provost Marshall (i.e., the officer in charge of the Military Police). MOA §5-b(1). The MOA sets out the following "Report and Notification Requirements":

> Every military member and civilian members of the military community will report all known and suspected incidents of child abuse to the RPOC with exceptions to the reporting requirement for privileged communications as listed in the appropriate regulation. The RPOC will assure that notification is made to DHS-CWSB of all known and suspected on-installation incidents of child abuse, in

addition to notifying the appropriate team and the appropriate civilian law enforcement authorities. ...

MOA, §9. The MOA goes on to specify "Investigation and Reporting Procedures" in §10:

    a. On-installation incidents will initially be investigated by military law enforcement personnel.  The DHS-CWSB social workers may assist in the investigation of on-installation incidents. ...

    b. DHS agrees to investigate all credible reports of intra-familial maltreatment cases referred by military personnel. ...

MOA §10-a – b.

The MOA thus requires that mandated reporters make their reports to the RPOC, and not to CPS. The RPOC, however, is required under the MOA to ensure that notification is made to CPS of all known or suspected on-installation incidents of child abuse.  Yet the MOA clearly provides that all on-installation reports of suspected child abuse will be initially investigated by the Army, and that CPS will only participate in that investigation at the request of the military.  This explains why HPD Officer Miller, who responded to the Acute Care Clinic on February 28, 2005, told investigators that he "often has to tell [the Military Police] that they need to handle a matter themselves because it happened on base."

In contrast to the MOA, AR 608-18 §3-4 does not include any requirement that the RPOC (or anyone else) notify CPS when a report of suspected child abuse is received.  The relevant "Army reporting requirement in abuse cases," under AR 608-18, is as follows:

> b.      All installation law enforcement personnel, physicians, nurses, social workers, school personnel, FAP and CYS personnel, psychologists, and other medical personnel will report information about known or suspected cases of child and spouse abuse to the RPOC or appropriate military law enforcement agency as soon as the information is received.

AR 608-18 §3-4(b).

The operative regulation for Schofield Barracks and Wheeler Air force Base during the relevant time period appears to have been Policy Memorandum USAG-HI-14, captioned "Reporting of Child Abuse in Army Operated and Army Regulated Activities." This regulation required the Army to conduct its own "initial investigation" to determine "if the incident is credible":

> 7. Procedures.
>
>     a.      All incidents of child abuse in AOA and ARA shall be reported immediately to the RPOC. The MP Desk Sergeant at Fort Shafter is 438-7114 and Schofield Barracks is 655-7114.
>
>     b.      The MP Desk Sergeant shall dispatch the Patrol Supervisor, MP patrol, Military Police Investigator (MPI) and CID Special Agent, as appropriate. MP and CID internal policies outline investigation procedures. MP and CID will begin the initial investigation and interview to determine law enforcement disposition. When the investigation is in the quarters of an FCC provider the MP and CID special agent will observe the physical condition of the quarters for obvious signs of neglect.
>
>     c.      The agency investigating the case will notify the following agencies upon completion of the initial investigation if the incident is credible:
>
>     (1) The CRC point of contact at TAMC is at 433-6680 for reports in the Tripler, Fort Shafter, and Aliamanu Military Reservation areas. The CRC point of contact at Schofield

Barracks is at 655-9804 for reports in the Schofield area.

(2)     The State of Hawaii CPS telephone 832-5300.

(3)     The Honolulu Police Department, Juvenile Crime Prevention Detachment (JCPD), telephone 529-3201.

Taken together, these regulations and the MOA clearly set out an elaborate set of policies and procedures that mirror the State's child protective system, and provide an alternative system for notification, investigation, evaluation, and intervention in cases of suspected child abuse. It is undisputed that multiple reports of suspected abuse of Talia by her parents were made to the installation RPOC, thereby bringing Talia under the protection of the military's parallel system. Moreover, it is undisputed that the RPOC did not report to CPS any of the numerous incidents of suspected abuse of Talia that were reported to the RPOC. Here, the Government relied on its own parallel framework of child protective services to investigate and evaluate the repeated reports of suspected abuse of Talia.

**C.      THE GOVERNMENT'S SUBSTITUTION OF ITS OWN CHILD PROTECTIVE SYSTEM FOR THE HAWAI'I'S CPS CREATED A DUTY FLOWING TO CHILDREN IDENTIFIED WITHIN THE SUBSTITUTE SYSTEM AS BEING THE SUBJECT OF SUSPECTED ABUSE**

It is undisputed that suspicions that Talia was being abused by her parents were reported to the installation RPOC on multiple occasions, including in

January, February, May, June and July of 2005.   The February 28 incident

involving the child care workers is illustrative. Although the child care workers

breached their duty under HRS Chapter 350 to report their suspicions of child

abuse to CPS, there is no question that they did report their suspicions of abuse to

the RPOC, as required by AR 608-18.  In that limited respect, the Government's

parallel child protective system operated exactly as it was intended to operate.  The

report of suspected child abuse was made to the RPOC who then had the

responsibility to engage the Government's parallel system to investigate and

evaluate the allegations, and to intervene as appropriate.

In other words, the Williams family was brought into the military's

substitute child protective system by reports of suspected abuse on multiple

occasions during the six months leading up to Talia's death. The military's

alternative child protective system essentially supplanted the functions and

responsibilities that otherwise would have fallen to CPS. And, just as a report of

suspected child abuse made to CPS was held by the Kaho'ohanohano Court to

create a special relationship between CPS and that child, triggering an actionable

duty on the part of CPS personnel to use due care to protect the child, so too a

report to the RPOC of suspected abuse of Talia gave rise to an analogous

actionable duty on the part of the Army's parallel child protective system to protect

that defenseless child. Having undertaken to provide child protective services to

Talia through its own substitute system, "the Government assumed responsibility to 'perform its Good Samaritan task in a careful manner." <u>Indian Towing</u>, 350 U.S. at 65. Tragically, that system failed miserably in providing Talia the protection she was owed.

**D.   THERE ARE AT LEAST THREE ADDITIONAL, INDEPENDENTLY SUFFICIENT GROUNDS FOR A DETERMINATION THAT THE GOVERNMENT HAD A DUTY TO PROTECT TALIA**

The <u>Kaho'ohanohano</u> case plainly supports a determination that a special relationship existed between Talia and the military's on-installation child protective system, thereby creating an actionable duty to protect Talia. Yet there are at least three additional, independently sufficient bases under Hawai`i law for a determination that the Government had a duty to protect Talia.

The Hawai`i Supreme Court has adopted the approach codified in §324A of the Restatement (Second) of Torts with respect to "the voluntary assumption of a duty":

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to complete his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or

35

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Tabieros v. Clark Equipment Co.,85 Haw. 336, 358-359, 944 P.2d 1279, 1301-1302 (1997), quoting Restatement (Second) of Torts §324A (1965). Here, the evidentiary record supports a finding of an actionable duty under each of these three alternative bases:

(a)  The manifold failures of Government employees to exercise reasonable care in connection with reporting, investigating, and evaluating suspicions that Talia was being abused, and in protecting Talia from abuse, unquestionably increased the risk that she would be harmed.   See also Fochtman v. Honolulu Police and Fire Department, 65 Haw. 180, 649 P.2d 1114 (1982).

(b)  By choosing to handle the repeated reports of suspected abuse of Talia within the military's own on-installation child protective system, the Government clearly undertook to perform a duty owed by the State's CPS to Talia.

(c)  Talia plainly suffered harm, and ultimately was murdered, because of reliance by CPS and Talia on the military's undertaking of the responsibility to exercise reasonable care to protect Talia.

In short, there are multiple paths to a finding under Hawai`i law that the Government owed Talia an actionable duty, quite apart from a finding of a special

relationship under <u>Kaho'ohanohano</u>. Yet all of these alternative grounds for a finding of an actionable duty come down to the same indisputable fact: the Government assumed the responsibility of protecting Talia from abuse on its military installation, and thereby prevented the State's Child Protective Service from providing that protection.

## V.   CONCLUSION

The reporting system set up by the Government in its parallel on-installation child protective system funneled reports that Talia was being abused away from CPS and into the military's parallel system of child protective services.   The military's substitute child protective system, codified in its regulations and in the MOA, then assumed the responsibility to assist and protect Talia.   Under the Hawai`i Supreme Court's decision in <u>Kaho'ohanohano</u> and the United States Supreme Court's decisions in <u>Indian Towing</u>, <u>Sheridan</u>, and <u>Olson</u>, and under §324A of the Restatement, there can be no doubt that the Government owed Talia an actionable duty of protection.

DATED:  Honolulu, Hawaii, March 4, 2010.

_____
MARK S. DAVIS
MICHAEL K. LIVINGSTON
YVONNE L. GEESEY

Attorneys for Plaintiff

OF COUNSEL:
DAVIS LEVIN LIVINGSTON

| MARK S. DAVIS | 1442-0 |
| MICHAEL K. LIVINGSTON | 4161-0 |
| YVONNE L. GEESEY | 8785-0 |

851 Fort Street, Suite 400
Honolulu, Hawai`i  96813
Telephone:  (808) 524-7500/Fax:  (808) 356-0418
Email:  mdavis@davislevin.com
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI`I

**TARSHIA WILLIAMS,** et al.,

**Plaintiff,**

vs.

**UNITED STATES OF AMERICA,**

**Defendant.**

CIVIL NO. 08-00437 ACK BMK
(Federal Tort Claims Act)

**CERTIFICATE OF SERVICE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was hand delivered to:

Thomas Helper, Esq.
PJKK Federal Building
300 Ala Moana Bvd., Room 6-100
Honolulu, HI  96850
Attorney for Defendant

tom.helper@usdoj.gov

DATED:     Honolulu, Hawaii, March 4, 2010.

YVONNE L. GEESEY
Attorneys for Plaintiff