IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| Tarshia Williams, | ) | CV 08-00437 ACK-BMK |
| individually and as the | ) | |
| Personal Representative of | ) | |
| the Estate of Talia Williams, | ) | |
| a Deceased Minor, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER GRANTING IN PART, AND DENYING IN PART, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PROCEDURAL BACKGROUND

On October 3, 2008, Tarshia Williams, individually and as the Personal Representative of the Estate of Talia Williams, a Deceased Minor ("Plaintiffs"), filed a complaint against Defendant the United States of America (referred to herein as "Defendant," the "Government," or the "United States").

On February 8, 2010, at the dispositive motion deadline, Defendant filed a Motion for Summary Judgment ("Motion" or "MSJ").  At the same time, Defendant filed a Separate and Concise Statement of Facts in Support of the Motion for Summary Judgment ("Motion CSF").

On March 4, 2010, Plaintiffs filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Opposition" or "Opp."). Plaintiffs also filed a Concise Statement of Facts in Opposition to Defendant's Motion ("Opp. CSF"). Plaintiffs attached the March 4, 2010, declaration of their attorney Yvonne L. Geesey ("Geesey Declaration"), which authenticates exhibits 1-31 as complete copies of the attached documents.

On March 11, 2010, Defendant filed a Reply Memorandum in Support of its Motion for Summary Judgment ("Reply").

The Court held a hearing on Defendant's Motion on March 25, 2010.

## **FACTUAL BACKGROUND**[1/]

This case arises out of the death of Talia Williams, a minor, who died while living on a military base, allegedly as a result of child abuse from her father and stepmother.

Plaintiff Tarshia Williams' daughter, Talia, was born on March 20, 2000, in South Carolina, and she died on July 16, 2005. Compl. ¶ 2. Plaintiff Tarshia Williams was never married to Talia's father Naeem Williams. Opp. CSF Ex. 6 at 3 (noting that the marriage between Naeem and Delilah Williams was a first marriage for both). Talia's father, Naeem Williams, was a

---

[1/] The facts as recited in this Order are for the purpose of disposing of this motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

specialist in the U.S. Army residing in Hawai'i with his civilian wife, Talia's stepmother, Delilah Williams.  Compl. ¶ 3.  Naeem Williams was given legal custody of Talia on December 1, 2004 by the South Carolina Family Court.  Compl. ¶ 4.  He moved Talia to Oahu, Hawai'i on December 14, 2004, and she lived in military housing until her death seven months later on July 16, 2005.  Id.

Delilah Williams worked as a clerk at the Child and Youth Services (CYS) Central Enrollment and Registration (CERO) branch office at Schofield Barracks from December 2004 through July 2005.  Motion CSF ¶ 3.  Donna Small and Precious Stevens were also clerks at CYS CERO, during this time.  Motion CSF ¶ 3. Rochelle Goodwin, Assistant Outreach Director, supervised the clerks until early June 2005, when she moved to the mainland and Kristi Almeida, Outreach Director took over.  Id.  The CYS CERO clerks were responsible for processing paperwork and entering data for Army families registering for or using programs such as child care, athletic programs, and recreation activities.  Motion CSF ¶ 4.  Neither Ms. Williams, Ms. Small, Ms. Stevens, Ms. Goodwin, nor Ms. Almeida had any responsibility for caring for Talia Williams or any other child in the Army CYS programs.  Id. The CYS CER office was at least a mile from the Child Development Center (CDC) where Talia Williams was cared for in the afternoons.  Motion CSF ¶ 5.

On January 10, 2005, Naeem Williams moved into the barracks because of an altercation with Delilah.  Opp. CSF ¶ 3,

Ex. 3.  On January 11, 2005, Delilah went to the barracks where she assaulted Naeem.  Id.  Delilah had brought Talia with her. Id.  The United States Miliary Police arrested Delilah for two counts of Assault, H.R.S. § 707-712, and Endangering the Welfare of a Minor, H.R.S. § 709-903.5.  Opp. CSF ¶ 6, Ex. 5.

On February 1, 2005, social worker Terry Martin of the Army's Family Advocacy Program interviewed Naeem and Delilah. Opp. CSF ¶ 7, Ex. 6.  Martin noted "the presence of classic dynamics of family violence" and "Wifes [sic] anger and her inability to manage it."  Id.  Martin incorrectly reported the "4 year old was not present during the incident."  Opp. CSF ¶ 9, Ex. 6 at USA 000340.  He did not interview Talia.  Id.  On February 16, 2005, the case review committee (CRC) of the Family Advocacy Program met to discuss Delilah Williams' January 11, 2005 arrest. Opp. CSF ¶ 11, Ex. 7.  The CRC recommended no action for Delilah and Naeem.  Opp. CSF ¶ 13, Ex. 7.

On February 28, 2005, workers at the federal child care facility at the Schofield Barracks in Hawai'i who cared for Talia Williams noticed marks on her that they believed might be signs of child abuse.  Motion CSF ¶ 1; Opp. CSF ¶ 15.  The workers reported their concerns to the military police; and criminal Investigation Division agent Michael Parker was assigned to investigate.  Id.  When asked by the doctor how she got the marks, Agent Parker heard Talia report that "[her] mother did it; [her] brother did it; [her] father did it" and that she was "bit

4

by a bug" and "bit by a spider."  Opp. CSF ¶ 17, Ex, 10 (33:22 -
34:5).  The doctor who examined Talia told Agent Parker that the
appearance of Talia's skin ailments was a condition called
desquamation, which is an infection of the skin, that it could be
the result of a failure to maintain the skin properly, and that
in his professional medical opinion the marks "were not caused by
abuse."  Opp. CSF ¶ 20, Ex. 10 at 31:14-32:3.  The doctor further
told Parker that he could not say with 100% certainty that it was
not abuse, but he could say with 98-99% certainty that it was not
abuse.  Opp. CSF Ex. 10 at 53:13-20.

On the last day Talia was cared for at the federal child
care facility was March 18, 2005.  Motion CSF ¶ 5.  On April 29,
2005, Talia's parents officially withdrew her from the enrollment
list.  Id.

On June 27, 2005, CYS employee Donna Small went to the
Family Advocacy Program and spoke with Hilda Borja regarding
concerns about Talia's safety and wellbeing.  Opp. CSF ¶ 36, Ex.
13.  Borja, a social worker, had been the FAP Manager from
February 2003.  Opp. CSF ¶ 37, Exs. 16 & 17.  Small told Borja
that she believed Talia was in danger and that Small and Rochelle
Goodwin suspected child abuse.  Opp. CSF ¶ 38.  Small told Borja
that she had heard Delilah Williams say it was "ok to whip a
child, just don't leave any marks."  Opp. CSF ¶ 40.  Borja told
Small that she would get back to her; however, she never did.
Opp. CSF ¶ 41.  Borja did not file a report or direct Small to

file a report with the military police.  Opp. CSF Ex 27 at
USA005739.

On June 29, 2005, Maribel Martinez called the military
police to report that a child who lived in the home behind hers
had been screaming for over an hour.  Opp. CSF ¶ 42, Ex. 19.
Military police officers responded to the Williams' home.  Opp.
CSF. ¶ 43.  In walking through the Williams' home, the Military
Police officers observed Talia upstairs in a room, naked and
mute, standing near feces on the floor.  Opp. CSF ¶ 48. Ex. 20 at
USA 001561; Ex. 21 at USA 001575.  The officers also noticed a
few marks on Talia, specifically scratches on her face.  Id.  A
military police investigator, Mark Meyers, was also sent to the
Williams' residence to investigate.  Opp. CSF. ¶ 51.  Talia did
not respond to either the military police officers or the
investigator.  Opp. CSF ¶ 48. Ex. 20 at USA 001563.  Investigator
Meyers asked Naeem Williams about the marks on Talia; Naeem
Williams stated that "a couple of days prior he was at a friend's
birthday party and another kid had scratched Miss Williams on the
face."  Opp. CSF Ex. 22 at USA00105.

On July 5, 2005, and July 8, 2005, Delilah's cousin,
Chasidy Taijeron, who lived in Texas and was on the phone with
Deliliah, heard Delilah and Naeem abusing Talia.  Opp. CSF ¶¶ 52,
54.  On July 11, 2005, Ms. Taijeron anonymously reported Naeem
and Delilah's abuse of Talia to Child Protective Services.  Opp.
CSF ¶ 56-61. The log completed by the CPS Intake worker noted

"Williams or William" and remarked "stepmother suspected of mistreating 5-year-old, will re-contact with the correct name and address."  Opp. CSF. ¶ 58.  No phone number, address, or information on the father was given.  Opp. CSF ¶ 61.

On July 16, 2005, Talia Williams was pronounced dead at Wahiawa General.  Opp. CSF ¶ 68.

### STANDARD

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal citation omitted).[2/]  Conversely, where the evidence could not lead a

_____

[2/] Disputes as to immaterial issues of fact do "not preclude
(continued...)

7

rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Miller v. Glenn Miller Productions, 454 F.3d 975, 987 (9th Cir. 2006).  The moving party may do so with affirmative evidence or by "'showing'--that is pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.[3/]

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See Celotex, 477 U.S. 323; Matsushita Elec., 475 U.S. at 586; Cal. Arch. Bldg. Prods., Inc.

_____

(...continued)
summary judgment." Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

[3/] When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial.  Miller, 454 F.3d at 987 (quoting C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc., 213 F.3d 474, 480 (9th Cir. 2000)).  When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party.  Miller, 454 F.3d at 987.

v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[4/]   The nonmoving party must instead set forth "significant probative evidence" in support of its position.   T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).   Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.   See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. See T.W. Elec. Serv., 809 F.2d at 630-31.[5/]   Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied.   Anderson, 477 U.S. at 250-51.

## DISCUSSION

The Court will first decide whether there are legal grounds to support a negligence claim against the United States here.   The United States can be held liable under the Federal Tort Claims Act for:

---

[4/] Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.   Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also, T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

[5/]At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.   Anderson, 477 U.S. at 249; Bator v. State of Hawaii, 39 F.3d 1021, 1026 (9th Cir. 1994).

injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346.   Thus, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances."   28 U.S.C. § 2674.   The Supreme Court has interpreted this to mean "the United States waives sovereign immunity 'under circumstances' where local law would make a private person liable in tort."   United States v. Olson, 546 U.S. 43, 44-45 (2005).

A successful negligence claim must satisfy the following four elements:

1.   A duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks.
2.   A failure on [the actor's part] to conform to the standard required...
3.   A reasonable close causal connection between the conduct and the resulting injury...
4.   Actual loss or damage resulting to the interests of another...

White v. Sabatino, 415 F. Supp. 2d 1163, 1173 (D. Haw. 2006) (citing Ono v. Applegate, 62 Haw. 131, 137, 612 P.2d 533, 538 (1980)).

Defendant's Motion for Summary Judgment principally focuses on arguing that the United States had no duty in this case.   See Motion at 5 (explaining that "defendant's central

argument concerns the legal question of duty . . . .").

A fundamental requirement of a negligence action is the existence of a duty owed by the defendant to the plaintiff that requires the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks. Kaho'ohanohano v. Dep't of Human Servs., 117 Hawai'i 262, 287, 178 P. 3d 538, 563 (2008).  The general rule is that a person does not have a duty to act affirmatively to protect another person from harm.  Id.; see also, Doe Parents No. 1 v. Dep't of Ed., 100 Hawai'i 34, 71, 58 P.3d 545, 582 (2002).  The fact that the actor realizes or should realize that action on his or her part is necessary for another's aid or protection does not of itself impose upon him or her a duty to take such action.  Id.

Two exceptions to this general rule are relevant here. First, an exception to this rule arises when a "special relationship" exists between the actor and the individual facing harm.  Id.  Second, the so-called "good Samaritan" doctrine provides that one who voluntarily undertakes a duty is obligated to use due care in performing that obligation.  White, 415 F. Supp. 2d at 1175.

**I.   Establishing A Special Relationship Based Upon H.R.S. § 587**

Hawai'i has followed the Restatement (Second) of Torts § 315 (1965), which provides:

> there is no duty to control the conduct of a third
> person as to prevent him from causing physical harm to
> another unless

11

(a) a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
(b) a special relation exists between the actor and the other which gives to the other a right of protection.

Restatement (Second) of Torts § 315 (1965); <u>Kahoʻohanohano v. Dep't of Human Servs.</u>, 117 Hawaiʻi 262, 285, 178 P. 3d 538, 561 (2008); <u>see also</u>, <u>Hanakahi v. United States</u>, 325 F. Supp. 2d 1125, 1131 (D. Haw. 2002) (citing <u>Seibel v. City of Honolulu</u>, 61 Haw. 253, 258, 602 P.2d 532, 536 (1979)); <u>Doe Parents No. 1</u>, 100 Hawaiʻi at 71, 58 P.3d at 582.

The Restatement (Second) of Torts § 314A provides sample situations in which a special relationship may be found. This list, however, is not exhaustive, and other circumstances may create a special relationship such that a defendant will owe a plaintiff a duty to take reasonable precautions to protect the plaintiff from the conduct of a third person. <u>Doe Parents No. 1</u>, 100 Hawaiʻi at 71, 58 P.3d at 582. Thus, the Hawaiʻi Supreme Court has expressly held that, if the State has entered into a custodial relationship with a particular person, then the State owes that person an affirmative duty to take reasonable steps to prevent any harm - which the State foresees or should reasonably anticipate - befalling its ward, either by his or her own hand or that of another. <u>Id.</u>

In <u>Kahoʻohanohano</u>, however, the Hawaiʻi Supreme Court found that a special relationship between DHS and alleged

12

endangered children was created by H.R.S. § 587, even though there was no custodial relationship.  Kahoʻohanohano, 117 Hawaiʻi at 290-91, 178 P. 3d at 566-67.  The Hawaiʻi Supreme Court noted that under the Restatement (Second) of Torts § 286 (1965), courts may adopt, as standards of conduct, the requirements of statutes "whose purpose is found to be exclusively or in part . . . to protect a class of persons which includes the one whose interest is invaded."  Id.  The Kahoʻohanohano court thus held, "there [could] be no dispute that the relevant statutory provisions, along with its administrative rules and policies, create a duty on the part of DHS to assist a particular class of persons to which [plaintiff] belongs and to prevent the type of harm suffered by [plaintiff]."  Finally, the Kahoʻohanohano court noted several courts in other jurisdictions with similar laws had reached the same conclusion.  Id.

Plaintiffs argue that:

> Just as a report of suspected child abuse made to CPS was held by the Kahoʻohanohano Court to create a special relationship between CPS personnel to use due care to protect the child, so too a report to the RPOC of suspected abuse of Talia gave rise to an analogous actionable duty on the part of the Army's parallel child protective system to protect that defenseless child.

Opp. at 34.

Plaintiffs assert that the parallel child protective system is created through AR 608-18 (and the various regulations implementing AR 608-18), under which they assert the Federal

13

Government has assumed the responsibility for performing almost all of the functions that DHS provides under H.R.S. § 587 when the suspected abuse occurs on a military installation.  Opp. at 26.  Plaintiffs describe AR 608-18 and the regulations implementing it in great detail and the Court agrees that "taken together, these regulations and the MOA clearly set out an elaborate set of policies and procedures that mirror the State's child protective system, and provide an alternative system for notification, investigation, evaluation, and intervention in cases of suspected child abuse."  See Opp. at 33, 26-33.

However, the Court cannot hold that these regulations create a "special relationship" and therefore a duty, because under the Federal Tort Claims Act, the United States is liable only to the same extent that a private person would be liable. 28 U.S.C. § 2674.  Because H.R.S. § 587 does not create a special relationship between private individuals and abused children, Plaintiffs cannot rely upon H.R.S. § 587 to create a duty of care the government owed.

In United States v. Olson, the United States Supreme Court explicitly reversed "a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver simply upon a finding that local law would make a 'state or municipal entit[y]' liable." U.S. v. Olson, 546 U.S. 43, 44 (2005).  The Supreme Court emphasized that "[t]he Act says that it waives sovereign immunity 'under circumstances where the

14

United States, if a _private person_,' not 'the United States, if a state or municipal entity,' would be liable." _Id._ at 45-46 (emphasis in original).

Thus, the Ninth Circuit and this Court have both rejected attempts to base FTCA liability upon a breach of an alleged duty created by federal regulations.  This Court has noted that, under the FTCA, "the United States' own policies and procedures may not create an independent duty to follow such policies and procedures where state law recognizes no comparable private liability."  _Covington v. United States_, 916 F. Supp. 1511, 1521 n.3 (D. Haw. 1996) (citing _Zabala Clemente v. United States_, 567 F.2d 1140, 1148-49 (1st Cir. 1978)); _see also_ _Hanakahi_, 325 F. Supp. 2d at 1136 (holding that "Plaintiffs cannot rely on Government regulations, rules or procedures to create a duty to prevent the accident").  Similarly, the Ninth Circuit has held:

> Even when the injury occurs on federal property, the finding of negligence must be based upon state law. _United States v. Muniz_, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); _Brock v. United States_, 601 F.2d 976, 979 (9th Cir. 1979).  Thus any duty that the United States owed to Catherine cannot be founded on Base Regulation 125-5; its source must be Montana law. _Younger v. United States_, 662 F.2d 580, 582 (9th Cir. 1981); _United Scottish Insurance Co. v. United States_, 614 F.2d 188, 193-94 (9th Cir. 1979).  The federal statute or regulation under which the employee acted only becomes pertinent when a state law duty is found to exist.  The federal statute or regulation may then provide the standard for reasonable care in exercising the state law duty.  _Id._ at 197 n.9.

_Lutz v. United States_, 685 F. 2d 1178, 1184 (9th Cir. 1982).

15

Thus, the federal regulations (AR 608-18 and its implementing regulations) cannot be considered in determining whether there is a special relationship upon which a duty to protect can be based. Further, because a private person does not have a duty to prevent harm to an abused child absent a special relationship (such as a custodial relationship or one created by statute) and because H.R.S. § 587 only creates a special relationship between DHS and abused children who have been reported to it, not between private persons and abused children, the United States cannot be found to have a duty under H.R.S. § 587.

## II.  Failure to Report in Violation of H.R.S. Chapter 350

Plaintiffs assert that "Defendant negligently failed to report or notify the appropriate agencies of the abuse of Talia Williams." Compl. ¶ 17.   Plaintiffs appear to allege that this duty arises under H.R.S. Chapter 350 (and comparable regulations implemented by federal regulation). Opp. at 34.  H.R.S. Chapter 350-1.1 requires certain persons, often referred to as mandated reporters, to report suspected child abuse.  H.R.S. § 350-1.1(a) provides

> Notwithstanding any other state law concerning
> confidentiality to the contrary, the following persons
> who, in their professional or official capacity, have
> reason to believe that child abuse or neglect has
> occurred or that there exists a substantial risk that
> child abuse or neglect may occur in the reasonably
> foreseeable future, shall immediately report the matter
> orally to the department or to the police department...

H.R.S. § 350-1.1(a).  The Hawai'i Supreme Court has not

16

determined whether a violation of this statute would create an actionable duty in tort against one of the mandated reporters. Defendant argues that this Court should apply the same framework the Hawai'i Supreme Court applied in <u>Kaho'ohanohano</u> to determine whether H.R.S. Chapter 350 creates a duty and thus look to the stated legislative purpose of the act, the detailed provisions established by statute and rule to carry out the Act's purpose, and the weight of authority from other jurisdictions.  The Court finds this to be the proper approach and begins by examining the language the legislature used and the stated legislature purpose.

A.   <u>Legislative Purpose</u>

As the Hawai'i Supreme Court has noted,

It is a well-established rule of statutory construction that this court's foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  And [this court] must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

<u>Kaho'ohanohano</u>, 117 Hawai'i at 288, 178 P. 3d at 564.  Unlike the Child Welfare Section, H.R.S. Chapter 587, Chapter 350 does not contain any statement of legislative intent.  The language of the statute itself is also ambiguous.  H.R.S. § 350-1.2 provides that the penalty for non-reporting is a misdemeanor, but does not provide any reference to civil penalties or a damages action for a failure to report.  Additionally, when civil suits are mentioned in Chapter 350, it is uniformly to clarify that there

17

is no such cause of action.  <u>See</u> H.R.S. 350-1.1(c), which specifically notes that "this subsection shall not be construed to serve as a cause of action against the department, the police, or the department of public safety;" H.R.S. § 350-3(a), which provides that "anyone participating in good faith in the making of a report pursuant to this chapter shall have immunity from any liability, civil or criminal that might be otherwise incurred or imposed by or as a result of the making of such a report;" and, H.R.S. § 350-3(b), which provides that "any individual who assumes a duty or responsibility pursuant to section 350-2 or chapter 587 shall have immunity from civil liability for acts or omissions performed within the scope of the individual's duty or responsibility."

Furthermore, as the court in <u>Cuyler v. United States</u> noted in concluding there was no private action for failure to report under Illinois law, "[t]he fact that the only sanction the legislature has provided is for a <u>willful</u> violation (which is not alleged in this case) suggests a reluctance to impose liability for merely negligent violations, and this is understandable for a variety of reasons." <u>Cuyler v. United States</u>, 362 F.3d 949, 955 (7th cir. 2004).  Similarly, under H.R.S. § 350-1.2, the Hawai'i legislators have provided "any person subject to section 350-1.1(a) who <u>knowingly</u> prevents another person from reporting, or who knowingly fails to provide information as required by section 350-1.1(c) or (d), shall be guilty of a petty misdemeanor."

18

H.R.S. § 350-1.2 (emphasis added).   Thus the legislature does not

appear to have intended to impose liability upon individuals

under this chapter based upon mere negligence, which is all

Plaintiffs allege here.[6]

The Cuyler court also noted a persuasive reason behind

the common law's settled reluctance to create good Samaritan

liability, which is that causation issues are very difficult in

cases of nonfeasance.[7]

---

[6] The Court notes that, even if there is a question of fact as to whether the mandated reporters here knowingly failed to provide information as required by Section 350-1.1(c) or 350-1.1(d), for the reasons detailed in this section, the Court holds that the statute does not create any duty which can subject an individual to tort liability in a private right of action.

[7] The Seventh Circuit in Cuyler observed, "Suppose the Great Lakes Naval Hospital had promptly reported the abuse of the Norman child to the state's child welfare department. What would have ensued? Would Higgs, who did not admit having abused the child, have been arrested? Probably not without an investigation, which might have taken more than 28 days to complete. Of course, just the commencement of an investigation might well have deterred her from further child abuse, but that is speculation too. The speculative character of causal inquiries in good Samaritan cases is another reason to doubt that the Illinois legislature intended to create tort liability by enacting a statute that does not purport to do so."   Cuyler, 362 F.3d at 955-56.   Although the court in Cuyler was examining whether there was a statutory right of action, the court analogized people failing to report child abuse under the statute to bystanders who fail to intervene to prevent injuries by third parties (good Samaritans).   See Cuyler, 362 F. 3d at 954 ("Nothing in the statute's text indicates that the legislature meant to expand the scope of tort liability to encompass people who fail to report child abuse and are thus analogous to bystanders who fail to intervene to prevent injuries by third parties.").   The Cuyler court noted that "there is no general duty in the common law to be a 'good Samaritan'" and explained that was why the plaintiff needed the abuse-notification statute to maintain the suit

(continued...)

Furthermore, as the Government emphasizes, unlike DHS, whose paramount purpose is to prevent child abuse, the mandated reporters have paramount obligations other than reporting child abuse, which weighs against finding that the statute was intended to create an obligation in tort.  The Government argues, "[t]he primary purpose of medical providers is to provide medical care; the primary purpose of police officers is to investigate crime; and the primary purpose of child care providers is to take care of children in the absence of their parents."  MSJ at 15.

The Government also argues that Plaintiff "fails to recognize the key differences between the Army employees and DHS employees, the most crucial one being that while the Hawaii legislature has found that DHS's duty to prevent child abuse is 'paramount,' the Army obviously has the very different paramount role of protecting national security."  Reply at 2.  The Court does not believe this is an appropriate comparison as it is much too broad.  Such a comparison is not consistent with the mandate of the Federal Tort Claims Act (and the case law interpreting it) that courts should look to the closest private party analogy.  Cf. United States v. Olson, 546 U.S. 43, 47 (2005) (comparing federal mine inspectors to private individuals who conduct safety inspections).

_____

(...continued)
because she had no common law tort claim.  Id. at 953.

The Court thus finds the legislative intent does not support a finding that H.R.S. Chapter 350 creates a duty that would subject the Government to tort liability.

B.   The Level of Detail Provided For By H.R.S. Chapter 350

The Hawai'i Supreme Court in Kaho'ohanohano looked to the detailed legislative guidelines provided for in H.R.S. Chapter 587, the administrative regulations implementing Chapter 587, and DHS' own internal regulations (its Green Book).  H.R.S. Chapter 350 is not comparably detailed.  H.R.S. Chapter 350, requires only an oral report followed by a written report "as soon as possible."  H.R.S. § 350-1.1(a), HRS § 350-1.1(c).  There are no specific, step-by-step obligations for municipal police departments, private child care providers, or private medical providers to take any specific steps beyond simply reporting the child abuse and certain basic information to DHS or the police. Chapter 350 does not set up an elaborate scheme of protection in the same way that Chapter 587 does.  See Kaho'ohanohano, 117 Hawai'i at 565-567, 178 P.3d at 289-291 (describing the detailed regulations and guidelines that DHS is required to follow and noting that "DHS is given not just a specific duty to act in response to such a report but ample and detailed authority to do so.").

C.   Authority from Other Jurisdictions With Similar Statutory Schemes

The Hawai'i Supreme Court has frequently looked to

21

other jurisdictions when analyzing its own laws.   In

Kahoʻohanohano, the Court looked to other jurisdictions that had

similarly found a duty arising toward abused children following

the abuse having been reported to state social services.   See

Kahoʻohanohano, 117 Hawaiʻi at 291-92, 178 P.3d at 567-68.   Here,

when considering comparable child abuse notification statutes,

the weight of authority weighs against establishing a private

right.

       The Cuyler court collected ten cases from various

jurisdictions that held that there was no private right of action

under similar child-abuse notification statutes.   362 F.3d at

964.   The Cuyler court then concluded that it believed those

decisions were correct and distinguished the one "outlier" case

as not on point because the court confined private actions to

deliberate violations of the statute at issue.   Id. at 954-55.

This Court has found one additional case in which a court has

held that a claim may be maintained based upon a failure to

report where the statute does not explicitly provide for such a

claim.   See J.M. v. Hilldale Ind. School District, No. 07-367,

2008 WL 2944997 (E.D. Okla, July 25, 2008) (in a case involving

alleged child abuse by a teacher, finding that the school

district was not "immunized" against plaintiff's claims based

upon the school district's failure to report the child abuse).

This Court, however, concludes that the majority of the cases

finding no duty to report are persuasive.[8/]

    D.    <u>Conclusion Regarding Liability for Failure to Report in Violation of H.R.S. Chapter 350</u>

Having undertaken an analysis of the factors the <u>Kaho'ohanohano</u> court considered relevant in determining whether there is a private right of action under a Hawai'i statute, the Court concludes that based upon the legislative purpose and history of Chapter 350, the level of detail provided for by Chapter 350, and authority from other jurisdictions, the Hawai'i legislature did not intend to create a duty that would subject a private party (and analogously the Government) to tort liability based upon a failure to report in violation of Chapter 350.

**III. Good Samaritan Liability**

Plaintiffs also argue that "having undertaken to provide child protective services to Talia through its own substitute system, 'the Government assumed responsibility to perform its Good Samaritan task in a careful manner.'"  Opp. at 34-35 (citing <u>Indian Towing Co. v. United States</u>, 350 U.S. 61, 69 (1955)).  Good Samaritan liability arises when one voluntarily undertakes a duty.  The Supreme Court has repeatedly found that the United States can be held liable under the Federal Tort

---

[8/] Having established that H.R.S. Chapter 350 does not create an independent duty to report, the Court agrees with Defendant that Delilah's CYS co-workers who overheard Delilah's statements regarding alleged child abuse did not have a duty to report that can support a private negligence action based upon a violation of the statutory duty.  MSJ at 25-26.

Claims Act if a private person would face good Samaritan

liability under state law.  In <u>Indian Towing Co. v. United</u>

<u>States</u>, the Supreme Court held that

> The Coast Guard need not undertake the lighthouse
> service.  But once it exercised its discretion to
> operate a light on Chandeleur Island and engendered
> reliance on the guidance afforded by the light, it was
> obligated to use due care to make certain that the
> light was kept in good working order; and, if the light
> did become extinguished, then the Coast Guard was
> further obligated to use due care to discover this fact
> and to repair the light or give warning that it was not
> functioning.  If the Coast Guard failed in its duty and
> damage was thereby caused to petitioners, the United
> States is liable under the Tort Claims Act.

<u>Indian Towing</u>, 350 U.S. at 69.  Similarly, in <u>Sheridan v. United</u>

<u>States</u>, 487 U.S. 392, 401 (1988) the Supreme Court held:

> By voluntarily adopting regulations that prohibit the
> possession of firearms on the naval base and that
> require all personnel to report the presence of any
> such firearm, and by further voluntarily undertaking to
> provide care to a person who was visibly drunk and
> visibly armed, the Government assumed responsibility to
> 'perform [its] good Samaritan task in a careful
> manner.'  The District Court and the Court of Appeals
> both assumed that petitioners' version of the facts
> would support recovery under Maryland law on a
> negligence theory if the naval hospital had been owned
> and operated by a private person.

<u>Sheridan v. United States</u>, 487 U.S. 392, 401 (1988).

    Thus, the Court must examine Hawai'i good Samaritan

law.  "Hawai'i case law relating to the voluntary assumption of a

duty or undertaking has generally followed the Restatement

(Second) of Torts (1965)."  <u>Tabieros v. Clark Equip. Co.</u>, 85 Haw.

336, 358-359, 944 P.2d 1279, 1301-02 (1997) (citing Section

324A); <u>Fink v. Kasler Corp.</u>, 3 Haw. App. 270, 272, 649 P. 2d

24

1173, 1175 (1982) (same); <u>see also</u> <u>White v. Sabatino</u>, 415 F.

Supp. 2d 1163, 1175 (D. Haw. 2006).  The Restatement (Second) of

Torts § 324A provides:

> One who undertakes, gratuitously or for consideration,
> to render services to another which he should recognize
> as necessary for the protection of a third person or
> his things, is subject to liability to the third person
> for physical harm resulting from his failure to
> exercise reasonable care to protect his undertaking, if
>     (a) his failure to exercise reasonable care
> increases the risk of such harm, or
>     (b) he has undertaken to perform a duty owed by
> the other to the third person, or
>     (c) the harm is suffered because of reliance of
> the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).  Section 324A

essentially defines an application of the good Samaritan

doctrine.  <u>See</u> <u>United Scottish Ins. Co. v. United States</u>, 614

F.2d 188, 197 n.7 (9th Cir. 1979) (citing Restatement (Second)

Torts § 324(b) and explaining "[t]hat provision provides for

liability where the good samaritan assumes a duty owed by another

to a third person"); <u>see also</u> <u>Meyers v. United States</u>, 17 F. 3d

890, 901-02 (6th Cir. 1994) (noting that "Plaintiffs rely on the

good samaritan doctrine as expressed in Section 324A of the

Restatement"); <u>McGowan v. Cooper Industries, Inc.</u>, 863 F.2d 1266,

1278 (6th Cir. 1988) (holding that the evidence failed to

disclose a gratuitous undertaking and "consequently, the 'good

samaritan' doctrine and its restatement in Section 324A is

inapplicable.")

In <u>White v. Sabatino</u>, 415 F. Supp. 2d 1163 (D. Haw. 2006), this Court examined the Restatement (Second) of Torts § 324A and concluded that under Hawai'i law, a designated driver undertakes a common law duty to a third party under the Section 324A framework after weighing Hawai'i Supreme Court and other court rulings and public policy concerns.  The Court cited Dean Prosser who explained that a good Samaritan may become liable to another party based upon the assumption of a duty.  <u>See</u> <u>White</u>, 415 F. Supp. 2d at 1176-77 (citing W. Page Keeton et al., <u>Prosser and Keeton on the Law of Torts</u> § 56 at 378-79 (5th ed. 1984)); <u>see also</u> <u>infra</u> p.29.  The Court further noted that:

> When one promises to undertake the designated driver responsibilities for an intoxicated person, he should recognize that this undertaking is for the protection of third parties, such as other drivers. He would be liable for injuries to this third party if his failure to exercise reasonable care in performing the designated driver duty a) increased the risk of the harm; or b) he undertook a duty that was otherwise owed by someone else, such as the commercial alcohol supplier; or c) the harm was suffered because parties such as the alcohol supplier or the victim driver relied on his undertaking.

<u>White</u>, 315 F. Supp.2d at 1176.  The Court then reviewed the evidence and determined that there were genuine issues of material fact because "there may be enough evidence to signify that [the party] commenced performance of an undertaking as a designated driver."  <u>Id.</u>  There, the Court held that "disputes about the specific language, context, and inferences drawn from conversations will bear on whether [the party] assumed a duty to

26

third parties and must be assessed by the trier of fact." Id. at 1179.

Here, the Government concedes that federal regulations can give rise to a state-law duty under the good Samaritan doctrine. See Reply at 7 ("federal regulations cannot give rise to a state-law duty (except in the Good Samaritan context discussed below)" and further arguing that the good Samaritan doctrine is not applicable here). In this case, the Court finds that the United States, by having established regulations regarding the "prevention, identification, reporting, investigation, and treatment of spouse and child abuse" (Opp. CSF Ex. 28, AR 608-18) and requiring that "every military member and civilian members of the military community will report all known and suspected incidents of child abuse to the RPOC," (Opp. CSF Ex. 29, MOA § 9) created a good Samaritan duty, which the Government is required to carry out in a careful manner.[9/] As

_____

[9/]The Government argues that policy considerations weigh heavily against the creation of a duty here. Reply at 10-11. The Government argues that:

> there can be no question that the Army regulations impose a greater obligation on Army employees than Hawaii law imposes on private parties and that the Army provides more social services to its community than are required by state law. . . . To impose a duty on an entity that voluntarily imposes more stringent rules upon itself, but not on a party that does the bare legal minimum, would have the perverse effect of discouraging private parties from going beyond the minimum.

Reply at 11. The Court notes that this is a traditional criticism of the good Samaritan duty in general. Despite such
(continued...)

discussed below, this duty arises under all subsections of the Restatement (Second) of Torts § 324A.

A.   Liability Under Restatement (Second) of Torts § 324A (a)

Defendant argues that it has no obligation under any of the subsections of the Restatement (Second) of Torts § 324A. Reply at 13-17.  Defendants note that § 324A(a) creates a duty only where the voluntary undertaking "increases the risk of harm" to a third party and cautions that the proper analysis is not whether the defendant has increased the harm over what it would have been if there had been no negligence, but whether the risk of harm is increased compared to if there had been no action at all.  "A duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all." Myers, 17 F.3d at 903.

Similarly, Hawai'i courts have noted that "if there is no duty to come to the assistance of a person in difficulty or peril, there is at least a duty to avoid any affirmative acts which makes his situation worse." Fochtman v. Honolulu Police and Fire Departments, 65 Haw. 180, 183, 649 P.2d 1114, 1116 (1982) (citing Prosser, Handbook of the Law of Torts § 56 (4th Ed. 1971)).  Prosser explains:

> If there is no duty to go to the assistance of a person in difficulty or peril, there is at least a duty to

_____

(...continued)
criticism however, the doctrine is law and applicable here.

28

avoid any affirmative acts which make his situation worse.  When we cross the line into the field of "misfeasance," liability is easier to find....

The result of all this is that the good Samaritan who tries to help may find himself mulcted in damages, while the priest and the Levite who pass by on the other side go on their cheerful way rejoicing.  It has been pointed out often enough that this in fact operates as a real, and serious, deterrent to the giving of needed aid....

This idea of voluntary assumption of duty by affirmative conduct runs through a variety of cases. Just when the duty is undertaken, when it ends, and what conduct is required, are nowhere clearly defined, and perhaps cannot be.  Following an early, leading decision in New York, never overruled, a large body of case law has been built up, which holds that a mere gratuitous promise to render service or assistance, with nothing more, imposes no tort obligation upon the promisor, even though the plaintiff may rely on the promise and suffer damage because of that reliance....

Due to its apparent harshness, however, the old rule has served chiefly as a point of departure; and very little is required for the assumption of the duty.

Prosser, Handbook of the Law of Torts § 56 at 378-79 (5th Ed. 1984).

Although the Hawai'i Supreme Court in <u>Fochtman</u> did not reference the Restatement (Second) of Torts § 324A, it nevertheless appeared to apply its principles and it cited to Prosser's discussion of the good Samaritan's voluntary assumption of a duty as quoted above.  In <u>Fochtman</u>, the Hawai'i Supreme Court held that "it is apparent from an examination of the whole record that a trier of fact could have concluded that the actions of Souza and Carlos were affirmative acts which worsened the situation of appellant's decedent."  <u>Fochtman</u>, 65 Haw. at 183-84,

649 P.2d at 1116.  In <u>Fochtman</u>, there were genuine issues of fact regarding whether the actions of "Officers Souza and Carlos worsened the situation of appellant's decedent by preventing Schrader from taking further steps to render aid and assistance." <u>Id.</u>  In that case, around sunset, Schrader had seen flashlight movements that led him to conclude that someone was in trouble near Hahaione Ridge.  <u>Id.</u> at 181, 649 P.2d at 1115.  Thus, he called the police, who arrived at his house and spent 20 minutes attempting to locate the lights, although they were unsuccessful. <u>Id.</u>  As the officers were leaving, one of the officers stated "maybe the power company is working up there or the military could be having some manuvers (sic) up there.  We'll check it out."  <u>Id.</u>  Those police officers, however, did not call the power company, the military or the fire department in charge of rescues.  They went back on patrol and only turned in a "Miscellaneous Cases" report around 11 p.m.  <u>Id.</u>

The appellant had become worried about her son and his friend and around 9:30 the police were contacted.  <u>Id.</u>  At around 11 p.m. Officer Russel Miyata found the vehicle the boys had traveled in at the end of Hahaione Valley Road.  <u>Id.</u>  The Honolulu Fire Department would not attempt a rescue without further information on the location of the hikers.  <u>Id.</u>  The rescue began at daybreak and the bodies of two hikers were found. <u>Id.</u>

Schrader indicated that, were it not for Officers Souza and Carlos, he may have gone to check out what was happening on his own.  Id.  Additionally, a captain in the Honolulu Fire Department stated that if he had known about the lights and if someone had been able to pinpoint their last location they probably would have started the rescue that night, not the next morning.  Thus, although the court noted that "[w]hen the evidence has been more fully developed, a trier of facts may very well come to the conclusion that there was no duty placed upon the officers to do anything more," it concluded that there were questions of fact that could not be resolved by summary judgment.  Id. at 184, 649 P.2d at 1117.

Here, Plaintiffs argue "the manifold failures of government employees to exercise reasonable care in connection with reporting, investigating and evaluating suspicions that Talia was being abused, and in protecting Talia from abuse, unquestionably increased the risk she would be harmed."  Opp. at 36.

In this case, the Court agrees that the affirmative acts of the Government, in establishing a system to investigate child abuse on military bases, may have increased the harm to Talia by preventing CPS from investigating.  This analysis is closely linked with the military's assumption of CPS' duties (under § 324A(b)) and the reliance engendered by the military regulations (under § 324(c)), discussed in greater detail below.

31

B.   <u>Liability Under Restatement (Second) of Torts</u>
<u>§ 324A (b)</u>

Subsection (b) provides for liability if a person has

undertaken to perform a duty owed by the other to the third

person.  Restatement (Second) of Torts § 324A(b).

The Military Services in Hawaii and the State of

Hawaii, Department of Human Services, Child Welfare branch

entered into a Memorandum of Agreement (MOA) to demonstrate their

agreement on "[e]stablishing procedures for the investigation of

child abuse and conduct of official business on military

installations in Hawaii."  Opp. CSF Ex. 29 at USA000178.  The MOA

states that "the military commanders, by virtue of the inherent

authority as installation commanders and through the specific

authority granted under each branch of the service's regulation

titled 'The Family Advocacy Program' <u>are responsible for the</u>

<u>protection of abused children of military families within his/her</u>

<u>command</u>."  Opp. CSF, Ex. 29, MOA ¶ 3 (b) (emphasis added).

Chapter 3 of AR 608-18 additionally provides a detailed set of

mandatory procedures for reporting and evaluating suspicions of

child abuse, for protecting victims of child abuse, and for the

treatment of child abuse, in sections entitled "Reporting of

Spouse and Child Abuse Incidents" (§ II (3-3 – 3-7)), "Evaluating

Allegations of Spouse and Child Abuse" (§ III (3-9 – 3-19)),

"Protection of Spouse and Child Abuse Victims" (§ IV (3-20 – 3-

22), and "Treatment of Spouse and Child Abuse" (§ V (3-23 – 3-

30)).

The Government argues that Plaintiff's assertion that the Army has substituted itself for DHS in investigating reports of abuse and thus assumed DHS' duties is contradicted by the plain language of the Army regulations and the specific facts of this case.  Reply at 15.  The Government further cites certain portions of the Memorandum of Agreement and argues "[a]ccordingly, nothing in the regulations supports plaintiff's contention that the Army somehow agreed to undertake DHS's role in investigating child abuse on military facilities."  Reply at 16.  Similarly, in oral argument, Government counsel argued that "there is a dual track" and "DHS is not being supplanted here. DHS still has all the same obligations and responsibilities that it would in a private sector setting."  Tr. at 22:04-07 (rough draft of transcript).  The Court disagrees and concludes that a fair reading of the MOA in its entirety does establish a dual track, but one in which the Army supplants DHS to some extent and is primarily responsible for investigating child abuse cases on military installations.

The Government cites Section 6(b) of the MOA (Opp. CSF Ex. 29 at USA 000182), which provides "the DHS-CWSB is the agency primarily responsible for intake, investigation, and the provision of protective services as deemed necessary to abused children within the State of Hawaii."  However, the Court notes that Paragraph 7(a) provides that "U.S. Army Criminal

33

Investigation Command is responsible for investigating felony crimes including child abuse on military controlled property." Opp. CSF Ex. 29 at USA 000184.  Furthermore, Paragraph 10, "Investigation and Reporting Procedures," details that "on-installation incidents will initially be investigated by military law enforcement personnel."  Opp. CSF Ex. 29 at USA 000185.  It also provides that "the DHS-CWSB social workers may assist in the investigation of on-installation incidents" and "DHS agrees to investigate all credible reports of intra-familial child maltreatment cases referred by military personnel."  Id. (Emphasis added).

     C.   Liability Under Restatement (Second) of Torts § 324A (c)

     Additionally, reliance on the Army regulations may have caused numerous parties, e.g., CPS, Donna Small, military police, to forgo other remedies or precautions against the risk. Restatement (Second) of Torts § 324A(c) (there can be liability if "the harm is suffered because of reliance of the other or the third person upon the undertaking").  Once CPS receives a report of child abuse, it maintains a central registry of reported child abuse or neglect cases and may retain records and information of alleged child abuse and neglect with respect to the child who is the subject of the alleged abuse.  H.R.S. § 350-2.  Such a system is designed to detect a pattern of child abuse or neglect, even though an individual case of alleged abuse may not be

34

substantiated.   Because of the Army's parallel system, there are numerous examples of reports that were not made to CPS, but were also not captured and investigated within the Army system.

First, Delilah Williams' arrest for endangering the welfare of a minor was not reported to CPS.  Instead, she was directed to the Family Advocacy Program for an evaluation.  Opp. CSF ¶¶ 5-10.  The Family Advocacy Program only investigated the assault charge and not the endangering the welfare of a minor charge.  Id.  Instead, the social worker incorrectly reported that the "4 year old was not present" at the time of the incident and did not interview her.  Id.

Second, the February 28, 2005, incident was not reported to CPS or recorded in any central database; in fact, a military investigator, Agent Parker, specifically determined that it should not be reported, and sent the Honolulu Police Department away.  Opp. CSF ¶¶ 21-22.

Third, because of the Army's creation of the Family Advocacy Program, Donna Small reported her concerns regarding potential child abuse to Hilda Borja, the manager of the Army Family Advocacy Program, not CPS.  Opp. CSF ¶¶ 36-41.  Donna Small told Borja that she believed Talia was in danger and that she and other of her co-workers suspected child abuse.  Opp. CSF ¶ 38.  Small told Borja that she had heard Delilah say it was "ok to whip a child, just don't leave any marks."  Opp. CSF ¶ 40.

Fourth, Hilda Borja called the military police

35

regarding Small's allegations but "did not report the suspected abuse in a manner that the Military Police were required to act upon." Opp. CSF Ex. 27 at USA 005739. Borja also did not report the allegations to the RPOC or CPS despite being a manager of the Army Family Advocacy Program. Opp. CSF ¶¶ 37, 41. The Army Family Advocacy Program creates a system for reporting and investigating child abuse incidents on miliary installations. See Opp. CSF Ex. 28; see also Opp. CSF, Ex. 29, MOA ¶ 3 (b) (stating that "the military commanders, by virtue of the inherent authority as installation commanders and through the specific authority granted under each branch of the service's regulation titled 'The Family Advocacy Program' are responsible for the protection of abused children of military families within his/her command."). Additionally, as discussed infra, Major General Mixon stated that the Army's investigation indicated Borja was negligent in her duty to report the suspected child abuse, see Opp. CSF Ex. 27 ¶ 3(a)(1), and Borja was about to be fired when she found a job with another Army entity not related to Schofield Barracks, see Tr. at 45:21-24.

Fifth, on June 29, 2005, Maribel Martinez called the military police to report that a child who lived in the home behind hers had been screaming for over an hour. Opp. CSF ¶ 42. The military police responded to the Williams' home, but despite finding Talia, "naked and mute, in a room standing near feces on the floor" and thinking that "something did not look right," no

36

reports were made to CPS.  Opp. CSF ¶¶ 43-51.

Had any of these events been reported to CPS, a file
may have been created on Talia Williams, such that when Chasidy
Tajeron called CPS on July 11, 2005, Talia might have been able
to be identified.  Opp. CSF ¶¶ 52-57.  Alternatively, had any of
these reports been properly reported within the parallel Army
system, the Army may have noticed a pattern and taken action
before it was too late.  Thus, reliance on the Army's programs
may have taken away any potential protections DHS may have
offered to Talia.

    D.   <u>Material Issues of Fact</u>

Having established that the United States undertook a
good Samaritan duty to prevent, identify, and investigate child
abuse, material issues of fact exist regarding whether the United
States was negligent in carrying out this duty.  The United
States does not attempt to argue that based on undisputed facts
it was not negligent but instead focuses principally upon arguing
that it did not have a duty.  Because that argument has been
rejected, the Court must deny summary judgment solely on that
basis.

The Court further notes that there do appear to be
numerous issues of material fact regarding whether the United
States was negligent in following the procedures it had set up to
investigate and prevent child abuse.  The United States itself
concedes that on June 29, 2005, Military Police responded to the

Williams residence after a report that a child had been screaming for over an hour, and "for this incident, if the MPs owed a duty, genuine issues of fact exist regarding breach of the standard of care." MSJ at 6. Furthermore, United States Army Major General Benjamin Mixon, concluded that "the death of Talia Williams followed a series of missed opportunities to potentially prevent the death of the child on 16 July 2005." Opp. CSR Ex. 27 ¶ 2. Major General Mixon additionally noted that he had directed the Garrison Commander to "investigate the action of DCA employees involved with the Williams family. This investigation has indicated the FAPM was negligent in her duty to report suspected child abuse." <u>Id.</u> ¶ 3(a)(1).[10/]

## IV. Motion for Summary Judgment With Regard To The February 28, 2005 Incident

### A. <u>Duty of Care While Talia Was In Child Care</u>

The United States concedes that its child care workers owed a duty of care to Talia Williams while she was in their care. MSJ at 11. The Government then argues that under Hawai'i law, the Court should look to a statute to define the standard of

---

[10/] One incident on which the Government specifically seeks summary judgment is a finding that "federal employees did not breach the standard of care with regard to the January 11, 2005 incident." MSJ at 26. The United States' argument on this point, however, is not supported by undisputed material facts. Given that this incident involved Delilah Williams' arrest for child endangerment, that military police and social workers were not negligent in their investigations. Plaintiffs have raised issues of material fact regarding social worker Terry Martin's investigation into this incident. <u>See</u> Opp. CSF ¶¶ 7-9.

care "when the purpose of the statute is to 'protect a class of persons which includes the one whose interest is invaded[.]'" MSJ at 19 (citing Lee v. Corregedore, 83 Haw. 154, 158, 925 P.2d 324, 328 (1996)).  The Government thus argues that H.R.S. Chapter 350 establishes the standard of care for mandated reporters such as day care workers.  The Government asserts:

> Here, child care workers appropriately reported concerns about possibly suspicious marks to military police.  Police then obtained a doctor's opinion that the marks were the result of a natural process, not physical injury, so there was no physical injury to explain.  The doctor further told military police that he saw no signs of any child abuse.[11/]  In light of this medical opinion, there can be no doubt that child care workers met the standard of care in reporting to the police, and that the military police met the standard of care in seeking a medical opinion, and then in relying upon that opinion that there was no evidence of child abuse.

MSJ at 22.

The Court agrees in part with the Government.  Child care workers did have a duty to Talia while she was in their custody and care.  There is no allegation, nor argument by Plaintiff, that Talia was injured or abused while in the presence of the child care workers.  Thus, one must look to other standards of care applicable to child care workers to report suspected child abuse. The Court agrees that H.R.S. Chapter 350 sets forth a standard of care.  The Court finds that these child

---

[11/] The Court notes that the doctor indicated he was 98-99% sure there was no child abuse, but that he was just giving a medical opinion.  Opp. CSF Ex. 10 at 35:10-20.

care workers did meet the standard of care.  It is not disputed that they reported the marks they saw on Talia Williams on February 25, 2005 to the military police and that those were the only marks they saw on Talia Williams.  H.R.S. § 350-1.1 requires that mandated reporters "shall immediately report the matter orally to the department or to the police department" (emphasis added).  The Memorandum of Agreement provides that the "Report Point of Contact (RPOC) is responsible for notifying agencies as required by State Statutes, military regulations and this MOA. The RPOC for child abuse involving military children is: (1) U.S. Army - the Provost Marshall. . . ."  Opp. CSF Ex. 29 ¶ 5(b).  The Memorandum of Agreement provides that "on-installation incidents will initially be investigated by military law enforcement personnel."  Opp. CSF Ex. 29 ¶ 10(a).  Thus, the Court finds that the child care workers met the standard of care by reporting the alleged abuse to the military police.[12]

Although Chasi Adamany stated that she and Summer "were scared" and that "Summer said that the doctor was white and old

_____

[12] The Court does not find it necessary to consider whether the child care workers alleged reliance on the doctor's medical conclusion was reasonable.  The child care workers did not have any duty to investigate any alleged abuse.  Thus, their only obligation was to report an alleged abuse, which Plaintiffs do not dispute they did in relation to the February 28, 2005 incident.  The Court wishes to be clear that this holding is very narrow and is not intended to, and does not affect, any potential liability the Government faces based upon the duties it assumed and the failure to use reasonable care in carrying out those duties, as discussed above in Section III, Good Samaritan Liability.

and didn't know what he was doing" (Opp. CSF Ex. 8), Chasi's subjective "scared" feelings and admissions regarding what Summer said does not alter the objective standard of care, which required the child care workers report any suspicions to the police.  They were not required to investigate their suspicions or to second guess the medical doctor.

    B.   <u>The Actions of the Military Police</u>

      In addition to arguing that the child care workers met the standard of care, the Government also asserts that "the military police met the standard of care in seeking a medical opinion, and then in relying upon that opinion that there was no evidence of child abuse."  MSJ at 22.  The Court, however, finds that there are material issues of fact regarding whether the military police met the standard of care.  Their obligation is not simply to report, but to investigate suspected child abuse as discussed in the good Samaritan analysis above.  Thus, material issues of fact exist regarding whether Officer Parker met the appropriate standard of care.  The Court is not making any findings of fact at this time, but notes that there may be issues of fact regarding the completeness and reasonableness of Officer Parker's investigation.  At this point, the Court cannot determine whether it was reasonable to rely on the doctor's opinion or whether he should have undertaken any additional investigation based upon Talia's comments to the doctor and child care workers that the marks were caused by her parents.

41

## CONCLUSION

For the foregoing reasons, the Court: (1) GRANTS Defendant's Motion for Summary Judgment as it applies to any alleged negligence by child care workers who had custody and control of Talia Williams in relation to the February 25, 2005, incident because they met the standard of care by calling the military police to report the marks they observed on Talia; and, (2) DENIES the remainder of Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, April 7, 2010.

_____
Alan C. Kay
Sr. United States District Judge


Williams v. United States, Civ. No. 08-00437: Order Granting In Part, and Denying In Part, Defendant's Motion for Summary Judgment